Thank you, Your Honor. Members of the panel, good morning. Happy Wednesday. My name is Mark Victor. I'm with the Attorneys for Freedom law firm, and I represent the appellant, Mr. Beal. With the court's permission, I'd like to reserve three minutes, if possible. Thank you, Judge. Mr. Beal was convicted of participating in a Hawaii conspiracy. The Hawaii conspiracy lasted over 10 years, and it dealt only in cocaine and in methamphetamine. There was no fentanyl ever sold, transported, or discussed in the state of Hawaii conspiracy. How do we know that? Well, from the record. There's testimony in the record. I could cite you to it if you like. In fact, the main testimony came from Mr. Oliverdi, who was the only conspirator from Hawaii conspiracy who testified at the trial. He specifically said there was absolutely no fentanyl involved in the Hawaii conspiracy. I don't think there's any dispute on that point. There's nothing in the record that suggests otherwise. The record's very clear about that point. Mr. Beal had never been to Hawaii. He had no discussions with anybody in Hawaii. He had no discussions with anybody involved in the conspiracy in Hawaii. He had no discussions with anybody charged in the conspiracy in Hawaii. Do you agree that—I assume you agree that what you're calling the Hawaii conspiracy was not just limited to Hawaii. It also included California, right? That's true. The drugs came from— So, I mean, you could just as easily call it a California conspiracy that involved Hawaii. But then the question is, is it a California-Hawaii conspiracy and a California-Ohio conspiracy? I think it's an excellent point, Judge. I think it's very fair to say that the Hawaii conspiracy involves two people, Mr. Fanua and Mr. Manoa, who were involved in both conspiracies. So, I can see that point. And the drugs came from California to Hawaii, cocaine and methamphetamine only. But what I'm calling the second conspiracy is completely different. Of course, it did have two people who were common to both conspiracies. As we know from the Supreme Court's case, just because we have people who are common to both conspiracies doesn't automatically merge the two conspiracies. I'm not arguing that otherwise either. The only two people, Fanua and Manoa, who were involved in both conspiracies, that represents the entirety of the connection between the two conspiracies. Absolutely nothing else in common. But what we might call the some kind of white powder, for sure. My client, Mr. Beal, picked up a bag in Ohio. He had it for about 10 minutes. The vehicle he was riding in was pulled over. He was arrested. The bag was searched. The white powder was found. That's the totality of his involvement in the case. But there are five issues on appeal, and I don't think I'm going to get to all of them in 15 minutes. The first issue in the entire case is the fentanyl, which eventually was tested as fentanyl many years later, should not have been admitted at the trial because there was what I would call a fatal chain of custody issue. That's issue number one. Issue number two may be equally as serious. The third superseding indictment, this is the indictment that charged Mr. Beal with the fentanyl conspiracy. There's no question this was filed after the five-year statute of limitations, and I would say fatally past the five-year statute of limitations. The third issue is an insufficiency argument. My argument is that there's insufficient evidence of a fentanyl conspiracy connected to Hawaii, which is what Mr. Beal was convicted of. And third, the trial counsel requested a specific unanimity instruction to avoid confusion, to avoid the fact that the jurors may not have been unanimous about which of these two conspiracies they were convicting him on. This was requested, and it was, in my opinion, erroneously denied by the trial judge. And finally, the argument that venue was not appropriate in Hawaii. However, the last three all depend on there being two conspiracies. That's close, but I don't totally agree, Judge, and I'll tell you why. I certainly do agree on the venue point. If there's one conspiracy here, venue's appropriate in Hawaii, even though I'm not conceding that case. But as to the unanimity instruction, even if there was one conspiracy here, my argument as to unanimity is the jurors could have been confused. In fact, there was counsel for the government in his rebuttal closing argued that this was a methamphetamine conspiracy. Now, maybe that was a mistake. It was also evidence brought into the case that when the white powder was initially seized, it tested as cocaine. Well, on that, where was that evidence? It was not a trial, right? There's no evidence at trial of that. Is that correct? That's not correct. There was evidence at trial that there were two places at evidence in trial where, and I might be able to even cite you in the records exactly where it was, if you give me a moment to find it here. The jury heard evidence that there was white powder thought to be cocaine, and it came from Agent Nan, who was one of the case agents. This was argued in the Rule 29 motion on page eight, and I can cite you to the transcript on January 23rd, 2021, page 35, lines 10 through 19. They heard that evidence. In addition, counsel for the government argued that there was a meth conspiracy in his rebuttal closing. This I would cite you to volume one, supplemental excerpts of the record, 176, lines 14 through 19. You can also find it in the record of the transcript on 6-25-21, page 97, lines 14 through 19. So the jurors heard this evidence. The first of those, that it was a powder believed to be cocaine, was the testimony about the field test, or was it just that that's what they thought it was? The way it came in, there was questioning, as I recall, and it was about the field test, and there was a question about the affidavit in the support of the warrant, and in that affidavit, there was some evidence that it had field tested for cocaine that came in from Agent Nan. So there was some confusion in the record on this point, and so I think back to your question, Judge, I don't agree that even if you find one overall overarching conspiracy, and I certainly don't concede that point, but even if you find against me on that point, I think the unanimity instruction, which was requested here, should have been given, and I think this court should make a point, frankly, trial judges, a very low transaction cost to give that instruction, especially when there's any question about confusion of the jury as to which conspiracy they're going to convict him on. So I certainly don't understand why. I guess I'm confused as to if you can see, and I understand what you're saying, but if you assume that there was only one conspiracy, I'm still not understanding what would the jury have been confused about, that the jury would have been thinking that there was two conspiracies and convicted him of the wrong of the two conspiracies, but if there's just one conspiracy, then they would have convicted him for a sub-conspiracy within the one conspiracy. I'm not understanding why the unanimity instruction still has any merit if there's only one conspiracy. It's certainly possible at trial that the jurors might have found that Mr. Beal was involved in a federal conspiracy involving California and- That's two conspiracies, so it does depend on the two conspiracies. In the end, you can't explain it except by saying there could have been a different conspiracy. No, even if there's one overarching conspiracy, I think that jurors could have thought in their heads that there's one conspiracy, which is the Fentanyl conspiracy, because they heard the testimony from the one co-conspirator who came in who was very clear, absolutely no discussion of Fentanyl whatsoever in what I'm calling the Hawaii, but more accurately could be called the California to Hawaii conspiracy. That testimony was very clear. There were no discussions about Fentanyl. There was no Fentanyl used at all. This was the government's witness who brought this evidence forward, and so I think jurors could have been presented with a choice here. Either A, acquit Mr. Beal, who they thought who had very clear evidence was guilty of maybe arguably a Fentanyl conspiracy, a California to Ohio conspiracy, or convict him of being involved in a conspiracy he really wasn't involved in at all. There was literally no mention. So to get off this, you have an argument to make on the chain of custody question, which as I understand it, has sort of two components. One is whether the evidence should have been introduced, and the other is how it played out at trial. Well, I think the chain of custody question is more of an admissibility question. I'm arguing that it should not have been admitted, and there are very many reasons for this. First off, there's no question there was an eight-day break in the chain of custody. This evidence was sent at some point to Quantico. What I'm particularly interested in is the judge was wrong about one fact, which is whether the label on the drugs was the same throughout, because in fact it was. That's right, Judge. Was that key to his admissibility decision such that we could disapprove the decision on the ground that he made a clear error as to that fact? Yes, Judge. In fact, if you look at my excerpts of the record from 11 to 36, you will find the judge is ruling on this point. The judge makes much to do about the fact that he believed, erroneously we know now, that the same case number was following that white powder from when it was seized in Ohio all the way through when it was tested in California. So he was wrong about that, but the record does seem to support that piece of the chain of custody form followed that white powder. Unless you assume that the piece of paper is lying on it, which you could assume about any chain of custody form, but there's no more reason to think that about this one than any other one. It shows that it left Ohio and it shows it arrived in Honolulu eight days later. It's weird to think that piece of paper didn't do that. Why would you think the drugs went with that piece of paper? Your whole argument is that because it was shipped to Quantico and we don't know what happened in Quantico and then it ended up in Honolulu, that something must have happened in that time. But we have testimony that says what the ordinary thing that would happen and why does that not suffice to bridge that. The same way that if somebody was to give testimony and say, well, we know the drugs are taken out of a locker, what ordinarily happens? Well, ordinarily, this is how I do it. And you say, and you have speculation about, I got all messed up in that process. And we'd say, well, but there's, we have testimony about what ordinarily happens. Actually, Judge, it's an excellent question. I'm happy to clarify this. First of all, the piece of paper that you're talking about, the evidence lock, which is my excerpts of 176, which was exhibit 44 at trial. If you look at that, you'll find that piece of paper makes clear that the drugs were completely lost. It doesn't have a clear chain of custody. It shows they were shipped and then there's an eight day lapse in the chain of custody. We don't know what happened during that period of time. Now the government tries to save this with the testimony you're talking about. This is the evidence manager of the Quantico lab. That person got on the stand, but if you review that testimony and if you look at it, it's actually the second volume of the government's supplemental excerpts of records, 346 to 349. That testimony, in my opinion, was devastating to this argument that they solved that problem. That person, Ms. Martin testified, she had no idea whether that package was ever received in or sent out of Quantico. No idea about whether the guy, I understand your argument on this, which is that they can't tell you about this particular package. I don't see how that's any different than somebody testifies, we put this package in a FedEx box with this number and we shipped it off. Then you said, and if your argument was, and we have no idea what happened for the three days. It shows up miraculously three days later to where they shipped it to, but we have no idea. It's like, okay, so you bring in the FedEx guy and say, what happens? Well, normally when something's shipped, it does this, this, this, this, and then it ends up in Honolulu. And that's what normally, well, can you say anything about that? That's what happened in this particular? Well, no, we don't know what happened with this particular package, but that's normally what happens. Basically, we've got the same thing, except for you've got Quantico acting as like a little middleman here. It says, well, we normally do, we get it from FedEx and we open up, we see there's too much drugs for us to test, put it back together and we ship it off. There's no testimony like that in this case, judge. The testimony from the evidence lab at Quantico, and I certainly asked the court to just review it. They say they have no idea what happened. They can't confirm even that their own procedures were followed when it finally hit Quantico. They have no idea what happens, a complete lapse. The judge admitted it because the judge erroneously believed that that number tracked all the way through. And the last point I want to make on that number, I'm going to sit down so I don't lose my rebuttal. But if that number, if that person had checked the actual package to see if that original number was on that package, and then they changed the number, I wouldn't be standing here arguing this. But the person who changed the number never looked at the package and there was no testimony in the case to say that that package of drugs actually had the original number on it. I thought, just a minute, two things. I thought he crossed out a number. They did cross out a number, but the person who crossed out the number never looked at the package to make sure that that original number was actually ever on the package, and there was no testimony. So what did he cross out on? If you look at the evidence lab, you'll find it crossed out within an issue. And finally, on what page is the judge's ruling that includes the erroneous determination? I'm not finding it in the record. I mean, I gave it, and if you look at my excerpts of the record, pages 11 through 36, the judge gives the judge's analysis of why the chain of custody fails, and you'll see it's all based on that number, which the judge was clearly wrong, just made a mistake about. Thank you, Judge. I know you, we took you past your time, but we'll give you two minutes. Thank you. May it please the court. Good morning. Tom Miller for the United States. Your Honor, the United States position, of course, is that there was no problem with the chain of custody. The district court did not abuse its discretion in admitting the fentanyl. The fentanyl and the packaging materials were sealed by the FBI. The chain of custody, both by the Ohio State Highway Patrol and the FBI, clearly document where the drugs were, how they were seized, what happened after they were seized. It seems to me like the district court sort of misunderstood that, and I don't know how this stuff works either, but that somehow like you take a sticker and you put it on the bag, the kilo bag of drugs, and you write a number and a sticker is on the bag on the drugs. And that's kind of what I thought when I first started looking at this case. But then I came to because there's never been a number on any of the bags throughout the years long that it was always any number would be on that form. And that form travels with the bags, but that the bags don't have, like, it's not like you stamp a number on the actual evidence itself. Is that, is that the right understanding of? That's my understanding that the bags were sealed. They were not numbered. Then they were shipped. They were handled properly. They were accounted for in the chain of custody. We don't know how they were handled. We don't know anything about how they were handled. Right. What do we know? We know what's on the chain of custody form, but we don't know how they were handled. And we don't know whether they were ever weighed when they at any point until the end. We believe. I'm sorry. Is that correct? We believe we know how they were handled because each person that handled them testified. They were not weighed ahead of time. We we know each individual from trooper Rachel Simmons that sees them. She turned them over to her supervisor, Sergeant Chris Coverstone. He sees he handled them properly, locked them up early morning hours of December 11th because the seizure happened at about 1130. I believe on December 10th, he put it in the PQA barracks, Ohio state police highway patrol barracks, evidence locker, drug locker, pick them up early the next morning, I think about 10 o'clock and then direct Sergeant now Sergeant Michael Mahaffey to take them to the FBI. Mahaffey, they were all signed off on that chain of custody, which were the Ohio State chain police chain of custody, which is exhibit. Excuse me, your honor, which is exhibit 43. They went to the FBI and they received at the lunchtime by Teresa Button. She was a clerk. It was at lunch hour. It was a, of course, closed FBI building. The Ohio State Highway Patrolman Mahaffey came there. She saw him on the camera. She let him in this, in the door, which is controlled. She took those, the drugs that were sealed and then held on to them, the evidence, not just the drugs, but the packaging material. Also the backpack, which is I think exhibit 40, the black backpack, which held the drugs and the shopping bag. And then the Walmart white plastic bag. And then the two sealed drug packets that were inside. She took them, held them at her desk for an hour, and then gave them to Layup Rock, who was the evidence custodian at the Dayton FBI resident agency. They were taken out and sealed again, according to the FBI procedures by agent Dennis. What does that mean taken out by the way? Taken out of the drug, the drug bill. They were signed out of the drug where they were held. I couldn't quite tell whether they, did they remain in the black backpack? No, they were, they, they, they were, they were, the drugs were separated from the, from the, the black backpack. The black backpack was, was held separately and, and the drugs were then put on the FBI chain of custody. In these bags, and they were, with the, with the, with the paper bag that was also bagged. The, the brown paper bag and the white, the white plastic bag from Walmart and the drugs were sealed together by agent Ng. Then they were, and the backpack was kept separately. The drugs were sealed and then put back into the vault at the Dayton resident agency, FBI resident agency by Brock. Then Brock was directed to send them to the Quantico laboratory and she sent her agent Ng's direction. And on the 23rd of December, she sent them out FedEx to the FBI laboratory. And I agree, that's where the documentation is not, it's not documented. They had, it was, they were sent out, they were sent out by FedEx. And then eight days later, on the 31st of May, excuse me, 31st of December, New Year's Eve, they were received at the Quantico laboratory, excuse me, they were received by the FBI Honolulu office in Kapolei by Pauline Cummings, who was the drug evidence custodian there. They were held there. Then they were shipped to the DEA lab. They were received at the DEA lab by Monica Price. That was, there was a period of they were held in the evidence locker at Honolulu, your honor. They were shipped out by Pauline Cummings. They were then, then they sat at the DEA vault, the DEA vault at the laboratory in Vista, California for about a year because as- I think we know all that, but I have a question. Yes, your honor. What, I mean, you were impressive in your detail, but the question that I asked before, which is, is it in the record that this was originally field-tested to be cocaine? I'm sorry, I didn't catch all of that. Is it in the record that this was originally field-tested to be cocaine? In the trial record? Either in the trial record or in the record that was before the district judge when he determined the motion to suppress. The motion to suppress, that came out in the motion to suppress. At the trial, council for Mr. Beale, a different council, had a motion to keep out the field test result that was cocaine. So that did not come out at trial. It was, there was a slip by agent Rudolph, retired agent Joel Rudolph, that he said that there was a cocaine or field test or something like that. He was admonished and they moved to strike. But it was in the record at the time of the motion to suppress. Yes. And therefore it was before the district judge when he made his decision. Or was it also at that time, I still haven't been able to find it, that the district court stated erroneously that there was a single label on the custody or number. Was that also in the motion to suppress? No, Your Honor. That was in the post-trial rule 29 motion for a new trial. So where is the judge's ruling on the motion to suppress in the record? That's what I can't find. Where is the judge's ruling? Yes. That was, the motion to suppress was in April, I want to say 29th of 2021. Somewhere, I haven't been able to find it. It must be somewhere. Okay. So if, but at that point he didn't make this mistake as you're understanding. There was no mistake made by, I say there was a mistake made because I can't find it in the But the record is clear how those drugs were handled. They were sealed. They were received intact at the DEA laboratory in Vista. They were identified by the individuals that seized them at the trial, both by the packaging. They acknowledged there was repackaging. Mahaffey said it seemed to be. Yeah, I think that kind of back to my original question, the judge made a mistake and he seemed to be operating under the idea that these drugs had a label on them. They had a number on them and obviously they didn't and if they had, it would have been that number because that number wasn't prevented until years later. So later. So, but what I'm trying to figure out is, so when I first saw that, I was like, oh, that seems like a pretty significant mistake. But then I came to the conclusion that, well, it didn't have a label on them, but they did have this piece of paper, the chain of custody form. And I don't know how that chain of custody form, which was signed in Ohio would have gotten to Honolulu, you know, this during this eight day period, the actual form, this form, which assigned a whole bunch of signatures of people signing it in Ohio and an exact same piece of paper is being signed by people in Honolulu. I don't know how it would have gotten there unless it was essentially traveling with these drugs, like as almost like a label. So from my perspective, that the judge was wrong that there was a sticker or something on each of the packages of drugs that had this number on it, but he was not wrong in the sense that there was obviously this chain of custody form traveled with those drugs from Ohio. They were mailed to or FedEx to Quantico. And then days later, this chain of custody form showed up in Honolulu with two bags of white powder. And so and the clothing and the packaging and the packaging. So in some sense, I think the judge was wrong about that being a label on it. But but in some sense, this is the label, like this chain of custody form seems to do that. Am I right about that? The United States police report is correct that the chain of custody form, the FBI chain of custody form accompanies the drugs because they were in the FBI custody at that time. Do they normally put I mean, I get the I don't even know how this normally works. But now I get the impression from this one case that you wouldn't normally put a sticker on the drug packages. This is, in a sense, the sticker, the piece of paper, this chain of custody form. It travels around kind of like the sticker, like like what this judge thought was the sticker on these on these items. The FBI chain of custody form does accompany the drugs when they left from from the Dayton Resident Agency through Quantico, his logic. So the reason because his logic, as I read the district court judge's logic, his logic is, listen, yeah, we don't we don't know exactly what happened specifically because we don't have any testimony by a member. We have this testimony of what normally happens. And we know that there is evidence that it got there, that it left. And he thinks it's a sticker. But you could you could you could replace that left with a certain chain of custody form. And eight days later, it arrived at the same with the chance. It seems it seems to me the judge's law and judge really relied on that logic. And it seems to me that logic is still intact, even though we got this, this number and the idea that there was a sticker on the drugs and correct the change in the case number. As I admit, that's erroneous. He wouldn't even be right. He wouldn't even be right, even if he had the other number, the one that's crossed out, which is probably the number. He wouldn't be right because there wouldn't be there wouldn't be a number on the drugs, on the clear plastic bags. There wouldn't be a number. Right. When they left, when they left Ohio, the drugs, when they left Ohio in the FBI custody to included that FBI chain of custody, there was a there was a separate Ohio State Highway Patrol chain of custody, which was last signed by the and it ended when the it was turned over to the FBI. It ended up being a sticker. My point is there wouldn't be some sticker on, you know, if I had a one kilo bag of white powder here, it wouldn't it wouldn't have no sticker. It would just have it would just have a chain of custody form with it. It would be sealed. And it normally my understanding is it's marked by the agent. You're with initials on it. Like it's marked. What is the chain of custody form or the drug? The drugs are in the plastic bag. They like right on it with a with a sharpie, sharpie or something. Yes. Why do they write on it? They initial it. They make what they might understand. They don't put one of these numbers on it. I don't know that, Your Honor. I can't ask a more formal question. OK, I'm looking at the judge's ruling on the motion to dismiss or deny a motion to suppress. But there's nothing in there about this chain of custody problem. Did he ever rule in advance on admissibility? Not at the not at the motion to suppress your honor. When did he rule? That was not he he moved. He ruled on admissibility at the trial, at the at the after the last witness testified. We we offered the exhibit or we tried to offer the exhibit and the chain of custody to the various witnesses and defense counsel, Mr. Isakson. So where is that in the record? I'm still trying to see where the district judge actually ruled. And I'm trying to find out. Do we just wait? Yes. He relied on this question of the number that he didn't. And he knew from the motion to suppress about the that there had been a field test for cocaine, but it wasn't at the trial. It was only alluded to at the trial. Is that accurate? Yes, Your Honor. That's correct. And then where exactly do I find the ruling? And so, you know, these kinds of things are supposed to be in the first volume of the excerpts of record. But as far as I can tell, they're not. So where are they? The ruling occurred after Monica Price. The drug is where just me a page number where I can find if you give me a moment, Your Honor. Okay. I believe. I see our three seventy three and three seventy three seventy three. Yeah, because there's not much reasoning there. That's just  it. All right, I'll find it. It's not worth it. Go ahead. It was on June 24th, Your Honor, in that in our supplemental excerpts of record. You can find it, but I would like to go ahead. Go ahead. I would like to cover the argument as to the separate the multiple conspiracies. One briefly, please. I said briefly, you're over your time, but I'm sorry, Your Honor. You know, the the the instruction that was given on conspiracy was a fentanyl conspiracy. And the verdict form talked about a fentanyl verdict form as the conspiracy. The defendant, Mr. Beal, did not object to the to the to that to that verdict form. He only objected to the instruction as to the knowledge of the rest of the the the fentanyl conspiracy instruction. He only objected to the knowledge that the government, that the defendant didn't have to know this specific drug, but knew that was some type of controlled substance. He, of course, argued that before the both before the judge on the rule twenty nine and in front of the jury. He argued that it was a fentanyl conspiracy, that there may have been a methamphetamine conspiracy in in Hawaii, but he wasn't part of that. That was separate from him. He also severed this case. He moved to sever. And it was clearly the United States. He wanted nothing to do with the co-defendants that were charged in Hawaii with more substantive offenses and to stay away from that. So the argument that a unanimity instruction is needed and that a multiple conspiracy instruction or the multiple conspiracy is there is sort of watered down because he he did get to argue that it was a his client was charged in a fentanyl conspiracy and that he wasn't involved in Hawaii and why it was was all that he wasn't involved in Hawaii. Why was he being tried in Hawaii? He was he was the defendant argued, of course, he wasn't in Hawaii because he was never in Hawaii. He didn't know those people in Hawaii. The people in Hawaii, Mr. Olivetti didn't know him. Mr. Olivetti didn't know fentanyl. But but it's it's clear that to his benefit, that he made that argument. And it was clear to the United States that his whole tenor of his strategic decision was made to keep himself away from the Hawaii part of the conspiracy. Okay. And a unanimity. Forget the unanimity question. I won't. I won't. But I want to know is whether there's because that only makes any sense if there were, in fact, a basis for thinking there were two conspiracies. I don't understand the argument to the contrary. So the question is, is what you're saying is it doesn't matter if it was a Hawaii if he was part of the Hawaii conspiracy? No, it doesn't matter. Right. We certainly believe it was one conspiracy, Your Honor. Right. The group that they looked at in in California where the drugs came from, the fentanyl came from, was going east rather than in this time rather than going west. But is it true that the the main what the member of the conspiracy would testify and said he didn't know anything about fentanyl? That was Mr. Olivetti. Right. Takivalu Kalisiali Takivalu Olivetti testified that he did not know fentanyl and he did not know the defendant and he did not discuss fentanyl with Mr. Fanula. Did anybody did Mr. Fanula say that he or he didn't testify, right? Mr. Fanula was set for trial in February. So he didn't testify. No. So so did anybody from the Hawaii conspiracy say that there was anything to do with fentanyl in the Hawaii conspiracy? The the only cooperator we had at that point was Mr. Olivetti. And so if Hawaii the only evidence was that the Hawaii conspiracy had nothing to do with fentanyl, then how was he convicted of the we had he had identified through the wiretap a group in Oakland that was transporting drugs into Hawaii that was being distributed by Hawaii distributors. And of course, that's Mr. Olivao, Mr. Olivetti. And the person that was doing that, the head of that was Mr. Fanula. It was California drugs coming to Hawaii and the fentanyl was California drugs that went east. But it was the same overlap in the time. But the only evidence, direct evidence from anybody involved was that the Hawaii conspiracy didn't have anything to do with fentanyl. So what was the connection? The connection was who was sending it? Mr. Mr. Fanula. He was using his people to move it to move the fentanyl east. He had previously just a month previously in September had sent methamphetamine to Mr. Olivetti, which was then sold on September 24th at Maui a wharf on Maui to an undercover police officer. That's methamphetamine. But I'm asking about the we now this is now turned into a fentanyl conspiracy, right? That's what you said. And so what I'm having trouble seeing what connected the Hawaii conspiracy to the fentanyl. We argued that it was a methamphetamine, cocaine and fentanyl conspiracy. But he had nothing. He himself did not handle any methamphetamine. And despite the field test, cocaine, as far as we now know, Mr. Beal, we do not have him involved with methamphetamine or cocaine. Well, no, we don't. We have course we have a prior drug conviction, but that didn't come out. That only came out to show knowledge. He has a prior drug conviction for cocaine in the district, U.S. District Court in the district of New Mexico in 2004. And that evidence came out only to show knowledge when he said when he was interviewed in Phoenix on September in September of 2019 by Agent Rudolph, they had no idea. The evidence is clearly sufficient to show that he was involved as leaving the chain of custody out for the moment, that he was involved in the transportation, at least, of fentanyl for 10 minutes in Dayton, Ohio, five years before he was charged. Right. So he was involved in some kind of a drug transaction involving fentanyl in Ohio. With Mr. Fenua. With Mr. Fenua. Okay. With Mr. Fenua because he spoke to Mr. Fenua? No, he was he we don't have any evidence. He spoke to Mr. Fenua. We don't have evidence that he was intercepted on the wiretap. It was the wiretap. The person who he got it from who was dealing with. The person who he got it from was intercepted on the wiretap and was in Hawaii. I don't even know that he simply didn't that this guy in Dayton called him up and said, would you carry some even assuming that he knew it was drugs, carry some drugs for me or that we don't have any evidence that he knew about Fenua. We don't know that. Of course, the law is pretty clear. You don't have to know every member of the conspiracy to become a member or to be liable for the conspiracy. But he didn't. He knew one person. And he and it turned out to be fentanyl, which he either did or didn't know. We don't know that. Which the main, the one person from the conspiracy who testified said was not involved in the conspiracy. So what's what is the sufficient evidence? Well, there's sufficient evidence that he was transporting some drugs for somebody. And he may have been part of a if you call that a conspiracy conspiracy with the person he got the drugs from to transport drugs in Ohio. But beyond that, what do we have? We have him involved with Mr. Fenua. Well, we don't have him involved. We have the person who got the drugs from him. Not directly, but we have him involved with Mr. Fenua through Mr. Chells and through the intermediary that then that that where the drugs were going out to the to to Ohio. Mr. Fenua, of course, sent drugs also to Hawaii. And that's clear from that part of the testimony of Mr. Olivetti, Mr. Agent Nam, Agent Rudolph explaining what they had as far as direct one on one. You're correct, Your Honor. I don't have that with him in methamphetamine in Hawaii. I see I've gone way over. My apologies. Answering questions. Thank you, Your Honor. Thank you, counsel. And thank you, Judge. This is almost impossible to do in 15 minutes aside. There's a lot of it. It's nobody's fault. It's just the nature of our situation. The issues are well briefed. And I really urge the panel to look at it. Judge, you hit the nail on the head. It's even worse than than was discussed here. Mr. Veal is talking to somebody who's identified a trial as Mr. X. Mr. X isn't charged. And we know nothing about Mr. X. Mr. X is speaking to a guy named Chells. Chells isn't charged in Hawaii, has nothing to do with Hawaii whatsoever. Chells is going to give you let me give you a really good title. You got Mr. Let's call him but he likes to keep his people separate because he doesn't want to. So Mr. Big works with he has two divisions. He has a division that works on the east side of town. He has the division that works on the west side of town. Right. But these side people don't talk to the west side people, etc. But they all work through Mr. Big and like, say, two other people that are at the top. All right. Is that one conspiracy or two conspiracies? It depends, Judge, if there's a ring, but it could but it could be one conspiracy. You would agree the situation that that could be one conspiracy. If there's a ring that binds the spokes together, then you got one. In this case, there's not there's not even a ring that's a rim. I would think that if they're all working through Mr. Big in the middle, then it's one conspiracy. That's not this case, Judge. But I was trying. I'm trying to. In other words, there's been a lot of emphasis on the fact that there's we know a lot about Hawaii. We know a lot about it. But there's also the fact that the people in the middle are involved in both. And so we keep calling this a Hawaii conspiracy. But that's why I said earlier on, it's a California conspiracy. And we definitely know people from California were involved in this, right? They're not the same people, Judge. For NUA is dealing, sending drugs to count to Hawaii from California. But NUA is dealing with CHELS. CHELS isn't even involved. CHELS isn't charged. CHELS is, we don't even know who CHELS is. CHELS is talking to Mr. X. Mr. X is talking to Bill. That's the way that's the way conspiracies work. There's no rim. There has to be a rim. In the King case. What do you mean? What does it mean there has to be a rim? Well, this is what the Supreme Court said in the, I'm going to butcher the name, the Kotyakis case. Yes. And also in Kenney, the Ninth Circuit talked about this in Kenney. There's got to be something that connects the independence folks together. And in this case, I see. So what you're saying is the fact that there's one guy in the middle isn't good enough. It's not good enough. That's exactly what Kotyakis was about. Judge, to answer your question, what you're looking for is in the excerpts of the record, in my excerpts from page 11 to page 36, that details exactly what the judge's reasoning was. On that motion to suppress, there was nothing about the. It wasn't a motion to suppress judge. It was my rule 49 motion. Rule 49. And this was in that motion. It was a discussion on the rule 49. The judge relied very heavily on the erroneous neighbor. I got the chain of custody right here. You look at it, you'll see from 1223 to 1231, nobody knows what happened. And if you just simply review the testimony that the government relies on Aaron Martin, which is the second volume of the supplemental excerpts, 346 to 349, you'll see she has absolutely no information whatsoever, even if it came to Quantico handled it, or even if their procedures that they discussed hypothetically were even followed in this case. The last thing I wanted to say very quickly was, I don't feel like one last one question about that. Do we have the FedEx label that Joseph was sent to Quantico? There was testimony in the record that it came from Quantico. Didn't say how she knew about that. I assume it was because of the FedEx. We don't know who sent the FedEx, what happened or any of that. But to get was there a label going to it? I'm not aware if there was, I didn't see anything in the record, but I can't say that there wasn't. The chain of custody form has the FedEx tracking number of the person who sent it to Quantico, right? It does, but there was nothing in the record, nor was there anything in the record about this evidence log traveling with the drugs. We're talking about that now, but that never came in. It's not in the judge's order. The last thing I wanted to say. So is your position then, you think that they just kind of like mailed this chain of custody form to Honolulu and mailed the drugs to, I mean, it's just like pure speculation on your part. To me, it seems just speculative or more speculative than the idea that, yeah, you shipped it via FedEx. Let's say they just shipped it straight to Honolulu, but we don't know what happened in the middle of that FedEx. If somebody in a FedEx pilot could have stepped out of the cockpit, walked back and opened up the package and swapped out the drugs or something like that. I mean, it's just pure speculation. We know it was sent to Quantico. You agree with that. You agree that the drugs were sent to Quantico, but it sounds to me like you're now saying, yeah, but I don't know that the evidence chain was, I don't know that this chain of custody thing was sent to Quantico. How else would we have this chain of custody thing today? Judge, it could have been a drop box for all I know. I don't know where the evidence log... This is the problem I have with your whole argument. It's extremely speculative. You could make that argument about anything in here. You could say, well, they accepted custody on 12-14. Well, and then several days later, it has another signature, but we don't know what happened. We don't know if this chain of custody form was put with those drugs when they were put into the evidentiary locker or whether somebody just like, you know, left the chain of custody form sitting around the lab. The problem is, you're just totally speculating that the whole chain of custody form depends upon the fact of presumption that normal procedures are followed. And we do have testimony about what the procedures are when Quantico receives a quantity of drugs like that. And you keep saying we don't have it, but we do have it. We don't have it specifically about these, but we have what normally happens, correct? Do you agree with that? We have testimony, but the testimony doesn't say what you're representing it says. The testimony is very clear that Erin Martin doesn't have any idea whether even their procedures were followed in Quantico. She can't say they received it. She doesn't know who handled it. But again, that's the same thing as saying, if I say, would you know, do you have specific knowledge that procedures were followed for the two years that the drugs actually sat in there and that somebody didn't go in there and accidentally swap out the drugs or something like that? You say, well, I don't have direct knowledge of that, but normally that wouldn't happen because our, because our normal procedures are A, B, and C. And that's the exact same test type of testimony we have here. That's why we have a chain of custody form. So we don't have to guess. No, no, no. That's not true though, because the chain of custody form actually has built into it. So when a chain of custody form says something gets locked into a locker for two years, it doesn't say in there that it's under video surveillance being watched the whole time. It's built into the chain of custody form is the idea that they are following normal procedures. And what you're trying to do is because there's an eight day gap between when something was shipped to Quantico and when it arrived in Honolulu, and that we have testimony about what those normal procedures are. You're trying to say, oh, um, we don't have any idea what happened, but you could make the same argument for the years that this thing sat in an evidence locker somewhere. I wouldn't make that argument because of course you wouldn't. But my point is, is that their argument is no stronger for those eight days. It is stronger judge because the chain of California for all those years, when it wasn't tested or in Honolulu for those years, when it wasn't tested, it shows where it is with nowhere. But how do we know that somebody didn't go in there and when they were trying to grab some other drugs, accidentally grabbed these and that the form had kind of slipped over and fallen on those other drugs. How do we know that? Now I'm into the cases where we're speculating. And you're not, you're just as much speculating because what we do know here is we have an a chain of custody form that it was mailed off to Quantico. We have a quantity of drugs this size. I would not test them. I would just mail them off to whoever controlled them, which would be the Honolulu office based on the number that was crossed out. That would be the normal process. And you're just saying, well, no, but something else must have happened. My client is serving 15 years in prison. We should have procedures that somebody in Quantico says, I received it. I put it in the evidence locker. It sat there for eight days. We might say that, but you could make the exact same argument about the fact that, you know, drugs literally sat in a thing for two years and there's nothing on here about what happened during that time. We should have procedures where they're kept under cameras. At the end of the day, the whole system is built on that. It tells you what happens on this form when they get switched out. But there are periods of time when you just have to assume that the ordinary, the ordinary, the presumption of regularity is what we often call it, that there's a presumption of regularity. And what I'm trying to figure out is for that eight days, why wouldn't we just apply the same presumption of regularity? If we didn't have any testimony about what happens normally when drugs get shipped to Quantico, I think you'd have a lot stronger case. But we do have testimony about what happens in the normal case. You would agree with that, right? We have testimony. And if it's review judge, you'll see, she says, I don't know what was ever received. I don't know our procedures were followed. I can't say. Exactly. But she does tell you what normally would happen if they were to receive drugs like that. And it fits with the eight days that are on this custody. The government has the burden to prove the chain. And keep in mind that your position would require that somehow weird things happen to the drugs while they were in Quantico. In other words, this procedure that she testified about was not followed, but somehow the chain of custody form made its way through, but the drugs were switched out or something. We have no evidence that the none, there's nothing in the record about that. You don't, you know what? But that would be, that would be just as true. That would be, that would be just as, I mean, that's just as true when we say we put the drugs into the locker, right? And you say we put the drugs in the locker for two years. We have no evidence that Joe, FBI officer Joe, didn't just take the chain of custody form and throw it in the bottom, the bottom drawer of his, of his desk. And then two years later, it'd be like, what is this? And they walked back and like, well, here's some drugs without a presumption of regularity comes in judge. If it's sitting in the, if the chain of custody shows it sitting in the evidence locker for four years, and I'm sitting here arguing, Hey, I don't know what happened during those four years. You're arguing, but if you have somebody that testified and said, you know what? We sent the drugs to Quantico and the drugs. And then we have eight days letters that drugs came from Quantico and you have testimony about what the regular FBI procedures are that would have made that happen. And then you're, you're just purely speculating that something else happened. What I'm not speculating about is the chain of custody shows an eight day break in it. Nobody knows what happens. This is a criminal case. This court ought to hold the government to a higher standard. My guy served in 15 years and we have no idea where this evidence went in. It tested as a, and then later on after the break, it tested as B. And so I think that's not conclusive evidence of tampering, but it's much more than we have in the speculation. Do you think the government, that the government made a mistake? I mean, is your theory that the government made a mistake? Or is your theory that the government like nefariously intentionally swapped these drugs out? I have no evidence of any bad faith in judge. I'm not making that case, but I don't have to show that. All I need to show is negligence. I got the substance testing as cocaine at the scene. It wasn't weighed. The packages were different. The people who testified at trials. What do you mean at packages? The people who differently, officer Simmons who pulled him over. But there was testimony that it was repackaged between the time when it was packaged in Ohio. But your time was packaged in Ohio and it was sent off. And then when they tested it, the lab said that they repackaged it. They said he split it into two different samples for each one. So I mean, judge, if the chain of custody is intact, I'm not here because I can't quarrel about, they opened it and put it in a different bag. But in the cause, I guess ultimately I'm quibbling with the idea that this chain of custody form is not intact. You have times in the chain of custody, in every chain of custody form where drugs are not, I mean, they're not like constantly being handed from one person to another with people. There are times when it is resting or when it's not, when it's in, and that includes in the ordinary course, you would, you'd have to agree that would include shipping. Like when you hand it to the FedEx guy and he takes it off and he, and it takes several days to get from point A to point B, you don't know what happened to those drugs during that time, but you have a presumption of regularity. And here, what you're saying is, yes, I'm okay with that, but I'm not okay with Quantico being in the middle, even though there's testimony of what Quantico does. It sounds very much like what a FedEx person would say if you put them on the stand and say, well, what happens when you ship this through Memphis? And they say, well, what happens is it comes off the plane. It goes on a little conveyor belt and it goes back on. And I just don't see where there's actually a gap here. Judge, I guess the question is, should Quantico be held to a standard in a criminal case where they're dealing with two kilos of white powder of some type? No, no, no. But the question is really actually, but that's not actually the question. The question is whether or not the jury could have found on this evidence, right? That's the question is whether a jury could have found on this evidence that whether a juror, right, because this is a substantial evidence challenge. So whether a juror could have found on this evidence that the government has burdened by, by holding them to the standard that they're required to hold, that's the best thing you have going for you. And I just don't see how a juror could, we could say the juror could not hold that when a juror could easily say, yeah, I mean, probably did what, what the FBI says normally happens the same way that happens when FedEx calls something. Judge, I'm just asking to review the testimony of Erin Martin. I mean, I have, I have, I have the testimony right here in front of me and. The cross-examination, which she certainly admits, I have no, it's a census, I have no idea. Okay. This is your, she's saying she has no idea what happened to this specific package. The same way, if you were to cross-examine a FedEx person and say, do you know what happened to the package number? Blah, blah, blah, blah. They'd be like, we do billions every day. I have no idea, but they could tell you what happens generally speaking to a package that could ship from point A to point B. And that's what we've got here. So you keep saying, yeah, but she says, I have no idea, but she's not saying she has no idea what normally happens. FedEx can tell you the packages at all times, Judge. And they just sent it from FedEx from Ohio to Honolulu. We have no problem here. The judge made some mistakes here in terms of trying to save it because of that number. And my point here was if the evidence tech had gone and checked the package and say, Hey, look, it's the 2014 number. I know your point. The question is just whether or not, I know you're just pointing to irregularities and the question is whether or not your, those irregularities are enough to make it so that the government doesn't have substantial evidence. If you don't know what bigger irregularities I could bring to your attention, then the chain of custody is absolutely broken for eight days and nobody has any idea where it is. The last thing I know my time is coming. I think we understand your argument. Thank you, counsel. Okay. And we thank both counsel for their arguments in this case.
judges: BERZON, MILLER, VANDYKE